My name is John Athens from Fairbanks, Alaska. I represent the plaintiff appellant Shirley Butler. I would like to reserve five minutes of the argument, please. This case concerns a small segment of the Trans-Alaska Pipeline that crosses the federally restricted native allotment of Shirley Butler. The BIA issued to Alyeska a grant for the right of way on Shirley Butler's land in 1981. The case concerns a principally a controversy on the interpretation of this grant, and in particular, a provision in the grant which provides that it shall the grant shall continue for a term coextensive with the term in duration of the TAPS agreement as such term in duration exists under Section 7 of that agreement. Now, the TAPS agreement is another right of way. It's the right of way for Alyeska on federal land. And Section 7 of the TAPS agreement is a four-part provision that has a number of things in it, but a principal concern is the provision that the TAPS agreement expires January 22nd, 2004. Well, that's not the principal concern. There's more in the agreement than that. It also provides that that's under Section 7. It may be extended. Well, certainly, Your Honor, Section 7 does provide that. But our position is, and where we think that this report erred, is that the BIA grant did not adopt the renewal provision part of Section 7. Well, it doesn't. It just says, as it may, whatever the language, as such term in duration exists under Section 7. It doesn't distinguish between provisions in Section 7. No, it does not, Your Honor. But the sole reference is as such term in duration exists under Section 7. And I think the critical point is it does not say that it incorporates the renewal provision of Section 7, and, in fact, it ties it to the term in duration that exists in Section 7. We believe that a ---- You're saying it should really say, as it exists or may be extended. And then the other side would be right. That's right, Your Honor. But as it exists, you mean as it presently exists, without any provision for extension or amendment. Right. A futile ---- And that's really what this case is about. That's the ---- That's right. That's right. Which is why I said 20 minutes was too long. It's not a very complicated question. I mean, you can argue about this, but it's just reading one sentence in each and deciding what they mean. That's right. That's right, Your Honor. We feel that exists does not encompass a future renewal, which is speculative and may never happen. And that we think another indication of the error of the district court is the fact that it's holding that the Section 7 is adopted in its entirety, renders part of the terms of the grant superfluous. And that is ---- and what we would like to point out is the sentence in the grant that it shall continue for a term coextensive with the term and duration of the tax agreement as such term and duration exists under Section 7 of that agreement. If you just completely eliminate the last part, as such term and duration exists under Section 7, the interpretation is under the district court's holding is exactly the same. The ---- that second dependent clause becomes meaningless. It does not add anything to the first part of the sentence. And we wanted to point out in the Second Circuit Sayers decision, that decision cautioned courts that where parties urge opposing interpretations of a document, the court has to be careful that it gives meaning to each part of the document. And we feel that the court in this case did not, by its interpretation, that it included the entire part of Section 7. Now, there also ---- Kennedy, you know, that language you just read says, as such term and duration exists under Section 7. And it says duration of right-of-way grant, which is the title of all of Section 7. That's right. But it's ---- but you can't forget about exists. It's the term and duration exists. And it's what exists in 1981 when the BIA grant was issued. And I don't see any way around that the term and duration in 1981 did not last longer than 2004. Now, it could be renewed, but that's not what existed in 1981, and the grant was clearly tied to what existed. And I think there's a reason for that, Your Honor. And I think the reason is that the BIA has to maintain control of renewal of these right-of-way grants. A renewal of the BIA grant is essentially a new grant of the land, a new encumbrance. And under the law, with respect to federally restricted native allotments, there has to be secretarial approval of an encumbrance of property. And extending the right-of-way is equivalent to a new encumbrance of the right-of-way. And the BIA has fiduciary duties to Shirley Butler with respect to her native allotment. And the BIA is required to protect that land and ensure that she is treated fairly and that the terms and provisions are fair and that the renewal is appropriate and necessary and for a correct duration of time. This is out of curiosity. Are there a lot of people who have similar grants that would be affected by this case? No. There are very, very few. I think there may be one, two, or three. It's almost unique. And the first grant was, what, $500,000 or $5,000? I didn't hear your question. The amount Ms. Butler got for the first grant was $5,000? No. Oh, you mean in 1974, there was a ---- There was a payment for the easement. For the 1981 grant, she received $25,000. But also, but you need to keep in mind, that wasn't just for the pipeline right-of-way. There was also an additional highway right-of-way. And additionally, she had a trespass claim for the trespass of the pipeline being on her property for approximately six or seven years prior to the ---- So the grant, the amount for the grant was only for a, was for more than, the $25,000 was for three things. Yes. And that was a lump sum payment, too. It also, it didn't, she was not paid any ---- I'm just curious about what we're talking about in this case. I see five lawyers, and we're talking about $10,000, $20,000, is that ---- Well, that was back then, what she was paid for. Okay. It's just curiosity. It's not important. Yeah. It's not a monumental sum of money. And actually, our position has always been that this should have been easily settled and taken care of, but it's not a great sum that we're talking about. But one of the critical points is that the BIA does need to be involved, and the effect of the district court's decision is to cut out the BIA and to cut out the BIA regulations. And, of course, one of the BIA regulations is that there has to be a renewal application through the BIA, and she has to be compensated under the regulation for the fair market value, plus any severance damages. It's just, it's a matter of simple fairness. Thank you, counsel. We also want to point out to the Court that the one of the problems with the district court's interpretation is that it allows a prohibited use of the Mineral Leasing Act. And that's important because that's the act that allows Alieska to renew its right-of-way on federal land, which in the Section 7 is part of the right-of-way agreement on the federal land. Now, the Mineral Leasing Act expressly applies only to federal land and expressly excludes native land, Indian land. The effect of the district court's decision is to allow the renewal and extension of the right-of-way on Shirley Butler's property, which is both Indian land and private land. That directly contradicts the Mineral Leasing Act, and we feel that that's another indication that there was a misinterpretation by the district court. And a final thing that we want to point out with respect to that particular argument is that if the BIA area director had intended the interpretation of his grant as the district court found it to be, one, I think the obvious question is why is there nothing in the grant and nothing in the administrative settlement documents between the parties that the BIA was to be excluded from the renewal process? Why is there not a word that Shirley Butler would receive not a penny more compensation no matter how many times the grant was renewed? Why was the grant silent as to the fact that the BIA was to be excluded? You know, she could have said in simpler English, you know, I'll give you this grant over my land for your pipeline as long as you maintain the pipeline. Well, first of all, it wasn't her prerogative. It's the BIA that has to make the grant. Well, the BIA could have, when they signed this agreement, said that. Well, I think the BIA was thinking in terms that the regulations, the published regulations controlled, and the public regulations clearly provide that if Alyeska needs a renewal, then it submits an application for the renewal. That's the way it works. That's the way it's set up. If Alyeska or the BIA wanted to depart from that normal procedure, then I think the burden was on the BIA area director Alyeska to point out, we're going to do something different, and we're going to have Alyeska to have authority. So is it your position that even if the language of these two documents? That what? Even if the language of the two documents properly interpreted would say that the grant continues as long as Alyeska maintains its rights under Section 7. Even if it said that, it would not be enforceable because it would violate the regulations? Well, we think it would violate the Mineral Leasing Act. We think it would violate the Secretarial Approval Act 25 U.S.C. Section 348. We think it would also violate the regulations. So the answer to the question is yes, that even if it meant what I just said, that it continues as long as the Alyeska right-of-way agreement continues. Even if it said that, wait a minute, even if it said that, are you saying that it would not be enforceable because it violates regulations? Yes, Your Honor. Okay. All right. Well, you have your five minutes to save if you wanted. Okay. Well, there are other arguments that are raised. You can make them all up, but then you won't have five minutes to rebuttal. That's all. It's up to you. Okay. Well, let me just quickly talk about the argument concerning the 1974 easement that was granted. Surely that was an alternative basis for the district court judgment. And the point that we wish to make on that is that cannot be an easement on her property. It is absolutely null and void under the statute because there has never been clear expressed direct secretarial approval of that easement. And notwithstanding that in the settlement documents, Mrs. Butler said she agreed to that easement, it cannot be operated as an encumbrance on the property without express secretarial approval. And there has never been that secretarial approval. Now, it is effective probably to the extent that it protects Alyeska from a claim for damages for its trespass for having the pipeline on her property until it got the 1981 BIA grant. But it does nothing more, and it cannot be effective as an encumbrance. And with that, Your Honor, I'll reserve the remainder of my time. Thank you, Judge. Thank you. May it please the Court and counsel, I'm Tom Meacham from Anchorage, Alaska. I'm representing Alyeska Pipeline Service Company, which is agent for the five owner companies of the Trans-Alaska Pipeline. I'm also representing those five owner companies who were named as defendants in the litigation. And for convenience, I'll refer to all of the appellees as Alyeska. And with me at counsel table are Susan Parks, who is assistant counsel with Alyeska Pipeline Service Company in Anchorage, and Peter Noggle, who is the land and permits manager with Alyeska. I would first – I will try to honor Your Honor's request to keep the arguments brief because I think the – Let me get to the arguments. Let me ask you this. We have five corporations and a big pipeline here and three lawyers. Have you thought about settling this case? Your Honor, there are two lawyers. Mr. Noggle is not a lawyer. But we have had settlement negotiations with the other side. I know they're not admissible. No. But are you satisfied that they're exhausted? We have a mediation service here. Do you think that it would be futile for you both to get together again at some point? Oh, I think it would be very beneficial. But at the present time, one reason Alyeska was pursuing this fairly vigorously and we had not been able to reach settlement was that there are some other properties that may potentially be affected by this ruling. So we're looking ahead. How many? You said there were just a few. I think there are three or four, Your Honor, at the most. The pipeline doesn't cross many native allotments, but the ones it crosses might have the same. Well, after the argument, we might suggest to you both that we'd make a service as an immediate or available. Thank you, Your Honor. I'd first like to offer my sincere apology to the Court and particularly to your law clerks for the fact that there was no table of consent or table of authorities in my appellee's brief, and I only discovered that. It's not necessary to apologize to the law clerks. They have greater harms in their life than that. Well, I know that it would make it much more user-friendly and I, if it had a table of contents, a table of authorities, and I did supply that to the clerk here, and I hope that's what's in the brief. This is not a situation where you have big oil overreaching and taking unfair advantage of an individual native allottee or failing to live up to its obligations that were early, earlier entered into. This is an attempt by Ms. Butler to unravel a comprehensive settlement of two pieces of litigation that was entered into 25 years ago and after she'd enjoyed the fruits of that settlement. As I indicated, there are some ramifications of this case that may affect other properties that the pipeline crosses. The nature of the settlement in 1981 was that Ms. Butler was to dismiss her State court action against Alyeska, which raised compensation claims regarding the 1974 right-of-way agreement that she'd given the pipeline, and Alyeska was to dismiss its administrative challenge to the validity of her native allotment application, which applied to 160 acres of Federal land on the south bank of the Yukon River. And Ms. Butler was to obtain title to her native allotment claim with a restriction on alienation in favor of the Bureau of Indian Affairs, BIA, and Alyeska was to have a clear right to have its pipeline across the Butler allotment. Her arguments have centered on the interpretation of one document, the 1981 grant, and also what Mr. Athens mentioned briefly, the 1974 grant, which was ratified and confirmed as part of the 1981 settlement negotiations. And as indicated, the district court in Fairbanks did hold that the 1981 agreement was governed by both the term and the duration of the Federal TAFs agreement. And I would like to suggest to the Court that a proper interpretation of the word exists, which the appellants have tried to emphasize somehow references the existing then-existing term of the pipeline, you could also use the word is found at or is present in the 1974 agreement, the Federal TAFs agreement, which would then indicate maybe a little more clearly that the BIA in its grant was simply borrowing the term and duration provision. It was not linking Ms. Butler's rights to the then-existing duration of that pipeline grant. It was borrowing both the term and duration so that, as she indicated in one of her letter, in her letter to Alyeska's counsel way back then, she wanted to make sure that when the oil stopped flowing that she would have clear title to her property. And that's excerpt of record number 8. There were four excerpts of record that I'd like to emphasize here that I think are critical to this, the whole argument, number 8, number 42, number 10, and number 9. And I will touch on those just briefly. First, I would like to say that Mr. Athens, in my view, didn't give you a complete picture of the Bureau of Indian Affairs authority over rights of way on native lands. The Bureau of Indian Affairs has full authority to grant a perpetual right-of-way. There's nothing in the regulations that says the right-of-way has to be for a term of years and that BIA has continuing control over the right-of-way and would control renewal. He has authority, the area director has authority to issue one in perpetuity. And in essence, what he did here was issue a right-of-way that said so long as the right-of-way renewals, this right-of-way will exist. And when the oil stops flowing, the land will go back to Ms. Butler. The Mineral Leasing Act has nothing to do with this. This is the Federal pipeline grant to Alyeska was renewed under the Mineral Leasing Act. That Act is not applicable to BIA rights-of-way, and that's very clear. I'd like to emphasize excerpt of record number 42, which, in our view, clearly states that Ms. Butler was fully represented, adequately represented by counsel. In fact, she had three lawyers, Peter Ashman, Peter Aschenbrenner, and Walters Lukowski, during this whole process. And this letter was written to David Case, who was the attorney advising the director of the Bureau of Indian Affairs. Kennedy. Is this letter on the record? It is on the record, Your Honor. And I'd like to just emphasize that that letter says that this is a settlement. It doesn't say that there will be ongoing payments that will be due for future renewals or anything of that ilk. And the concluding paragraph is, I believe that she understood the terms and that she ascended to them voluntarily and without reservation. So I think there's no real question here of overreaching. She knew what she was settling, and she was fully advised by competent counsel. Number 10, which is also on the record, I would just like to mention briefly, this is the stipulation of the parties, and this document does include the signature of the United States of America through Bruce Schultheis, officer of the regional solicitor, Department of the Interior, who was speaking for the department in this settlement. The stipulation that settled the administrative litigation over whether she should receive title to her allotment emphasizes that the parties acknowledge the validity and enforceability of the release of all claims that Ms. Butler signed, and that Alias agrees to pay through the Bureau of Indian Affairs to Shirley Butler, I'm quoting here, through the Bureau of Indian Affairs, from Alyeska the sum of $25,000, which sum the Secretary of the Interior, acting by the Bureau of Indian Affairs, has determined to be not less than the full and true fair market value of the rights of way described in the documents. And that's where I'll end the quote. So it was clear in our view that in 1981 the settlement was for a sum of $25,000, which was the fair and full compensation for the rights that Alyeska was receiving, and that included a right to continue on Mrs. Butler's land as long as oil flowed through the pipeline. And in this document, they also confirm that the parties acknowledge the validity and enforceability of those deeds of rights of way executed by Shirley Butler in 1974, and that was the document that Mr. Athens referred to at the conclusion of his remarks. And then they state that the parties will cooperate in an effort to assure approval by the Secretary of the Interior of this settlement in execution of all documents. And in our opinion, the Secretary of the Interior, through the Bureau of Indian Affairs, did approve the settlement because he dispersed the check for $25,000 to Miss Butler. If he had any concerns about any document in the settlement package that he didn't approve of, it would have been unlawful under the settlement for him or it would have been a breach of the settlement to go ahead and pay the money to Alyeska in the settlement. The final paragraph of this document number 10 in the excerpt of the record says that if the Bureau of Indian Affairs fails and refuses to implement the settlement, nothing herein shall preclude either party from taking any action to assert any or all claims and defenses it or she may have. So it's clear that the Secretary was expected to implement the settlement in accordance with the stipulation that was entered into that dismissed the administrative and court litigation, and that he did so. The final document I'd just like to refer to briefly is document number 9 in the excerpt of the record. This is Miss Butler's release of all claims. On page 2, I think it becomes quite clear that even though she is alleging that the area director of Bureau of Indian Affairs did not adequately approve, didn't put his signature on a document that indicated that either the 74 agreement was valid or that he was rejecting it, I think she's precluded by her waiver in this release of all claims for raising that argument. And this paragraph, and I quote the last part of the paragraph on page 2, it is further declared and represented that, as each of the undersigned has been represented by counsel at all times when the giving of this release was discussed and at all times in the conduct of litigation and appeals preceding settlement and in the settlement discussions themselves, and have further consulted with and have been advised by the Bureau of Indian Affairs, and that this release and the making of the settlement of which this release is a part have been agreed to by counsel and such bureau. So it's our opinion that Shirley Butler is precluded from raising any question about the validity of the Bureau of Indian Affairs' involvement in either the 1974 agreement and its ratification or the 1981 agreement by her specific acknowledgment in this release that the Bureau has been consulted and that it did consent. Your Honor, I don't believe I have anything more. Kennedy. Thank you, Your Honor. When was this pipeline built? When was it actually constructed? I believe, Your Honor, that the right-of-way agreement was the Federal right-of-way and the State right-of-way were issued in 1974. Construction took place in 74 through 76? 77. 77 was the date when it finally began operation. This wasn't big news in Nebraska at the time. Since it's still supplying a lot of oil to the lower 48, I hope it's big news now. Thank you, Your Honor. Thank you, counsel. Okay. We have three and a half minutes. Just a few comments. First, Mr. Meacham spoke of Mrs. Butler agreeing to the comprehensive settlement, and that's true. She absolutely did agree, and she still stands by the settlement she entered into. The question is what she thought the settlement was and what the settlement actually says, we believe, is something different from Alieska has interpreted it. The second point I want to make is we've talked about the renewal of the Taft's agreement under Section 7 of that agreement, and I want to point out that under that renewal and pursuant to it, the federal parties to that agreement were compensated and are being compensated for the additional 30-year renewal. Under the district court decision, Charlie Butler receives nothing despite the fact that they maintain that the right-of-way was renewed under the exact same provision that the right-of-way was renewed for the federal government. And it's a basic issue, fundamental. When they were renewed, was that in accordance with the provisions of the Trans-Alaska Pipeline Authorization Act? It was renewed in accordance with that act, but that act adopts specifically the Mineral Leasing Act, and the agreement for renewal specifically references renewal under the Mineral Leasing Act. And did that provide for compensation? It absolutely does, Your Honor. And yours does not? And under their position, the district court's position, even though it was renewed under that provision, Mrs. Butler gets nothing for a 30-years renewal period. Well, you know, as I asked your opposing counsel about the possibility of mediation, you know, we're talking about interpreting two sentences, which if you've got 100 lawyers, you can probably get 100 interpretations. Yes. Certainly amenable, and I would like to discuss the efforts that have been made and why they haven't been fruitful, but ---- Well, there's no point talking to us about it. You can talk to the mediators about it, and I hope you'll both come to a reasonable solution. Okay. I have just a few seconds, and the final points I want to make is that if exists in the BIA grant is given meaning, that actually resolves all the problems, and that's basically what it comes down to is allowing that to have some meaning and effect. The other point is, is that in summary judgment motions, reasonable inferences are required to be drawn in favor of the non-movement. We feel that Mrs. Butler's interpretation is certainly a reasonable inference of the grant. And finally, we want to point out this Court's Spaloon-Moose Creek decision, which says documents affecting Native Americans and their rights must be interpreted liberally in favor of the Native Americans. And all that, we think, goes to the point that the district court decision should be reversed. Thank you. Thank you. Thank you both very much. You'll hear from the Court about aviation, and I know both sides will take it seriously, because this is kind of a question of interpretation of documents, which, as I said, lawyers can reasonably differ about, and you never can predict how an unpredictable court is going to rule. So thank you both for the arguments. They're very helpful. And good luck. The case just argued will be submitted.
judges: Reinhardt, Paez, Strom